THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARILYN MILLER, Defendant-Appellant.

Second District No. 83—1083

Opinion filed November 1, 1984.

Mary L. Mikva and Patrick A. Tuite, both of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Fred L. Foreman, State's Attorney, of Waukegan (David E. Bindi and Mark L. Rotert, Assistant Attorneys General, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant Marilyn Miller appeals from her conviction of syndicated gambling (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1), claiming that: (1) she was not proved guilty of syndicated gambling beyond a reasonable doubt; and (2) the trial court improperly admitted a hearsay declaration of the defendant's father which implicated defendant in the charged offense.

On October 14, 1982, defendant and her father, Robert Dugan, were indicted for the offense of syndicated gambling (Ill. Rev. Stat. 1981, ch. 38 par. 28—1.1), for events which transpired between July 13 and September 10, 1982. The charges against Robert Dugan were nol-prossed. Testifying for the State, Jon Sandusky, a special agent with the Illinois Department of Law Enforcement, stated that he was conducting an undercover investigation of gambling activities in

Lake County during the months charged in the indictment. On July 9, 1982, Agent Sandusky was in the basement of the Green Mill Restaurant, where he had a conversation with Robert Dugan regarding placing bets on a horse race. After asking Dugan whether he had any phone numbers where Sandusky could call in the bets, Dugan wrote down two phone numbers along with the names "Marilyn" or "Deb." Dugan asked what name the agent wanted to use to call in the bets, and Sandusky responded with the name Jon Sanders.

On July 13, 1982, Agent Sandusky called one of the phone numbers given to him by Dugan. A female voice answered the phone, and Sandusky requested to speak with Marilyn or Deb. The woman asked who was calling, and Sandusky replied with the name Jon Sanders and stated that "Bob Dugan said it was okay to call this number." The woman then said, "This is Marilyn, what can I do for you?" Agent Sandusky asked for the betting line on the All Star game, which the woman was unable to get until later that day. Sandusky then requested the figures on a horse race that he had bet on with Dugan on July 8, and the woman responded that "her books showed [Dugan] a $95 winner." Later that afternoon, Sandusky called the same number and asked for Marilyn. The woman who answered identified herself as Marilyn; Agent Sandusky recognized her voice as being the same voice he had talked to earlier. He again asked for the betting line on the All Star game, and the woman provided that information and explained the odds. After hanging up the phone, Agent Sandusky called back several minutes later, again asked for Marilyn and, when she got on the phone, placed several bets totaling $175 on the All Star game. The woman read back the bets and stated something to the effect, "I'll assure one-seventy five." Sandusky also stated he would pick up his $95 from Dugan later. Sandusky testified that he recognized the woman's voice as being that of the woman who had previously identified herself as Marilyn.

Agent Sandusky called the numbers given to him by Dugan three more times in July, placing bets on horse races totaling $550. Each time he called, he spoke to a woman who identified herself as Marilyn.

On August 5, 1982, Agent Sandusky called again and placed bets totaling $170 with the woman identifying herself as Marilyn. Shortly before midnight on August 5, 1982, Agent Sandusky saw Robert Dugan and defendant in the basement of the Green Mill Restaurant. Special Agent Eugenie Dresel was also present. They were all seated at the same table along with defendant's husband, Don Miller. Over defendant's objection, Agent Sandusky testified that Dugan intro-

duced him to defendant by saying, "This is my daughter, Marilyn, the one you call your bets into ***." After the introduction, Sandusky had a conversation with defendant regarding calling in the bets; Sandusky recognized defendant's voice as being the same voice he had talked to on the telephone.

During the month of August, Agent Sandusky made three more phone calls to bet on horse races, each time speaking to the woman who identified herself as Marilyn. The bets during this month totaled $730. Sandusky testified that the voice of the woman on the phone was the same voice that he had spoken to on previous occasions and was the voice of the woman he had met at the Green Mill Restaurant.

In September, Agent Sandusky made three more phone calls to bet on horses and/or football games, each time placing his bets with the same woman whose voice he recognized as being defendant's, and who identified herself as "Marilyn." The bets during September totaled $750. Sandusky conceded on cross-examination that the person to whom he looked for his winnings or to whom he expected to make his payments was Robert Dugan and not defendant. Sandusky never promised to pay defendant any money.

The record indicates that during the period covered by the indictment, Agent Sandusky placed at least 11 bets totaling $2,375 with the woman he identified as being defendant. In addition to accepting these bets, on at least five occasions defendant advised Sandusky of the dollar amount which he owed to Dugan or which Dugan owed to him.

During a subsequent search of Dugan's home various items were recovered, including two telephones, an adding machine, five ledger sheets containing writing, schedules of sporting events, and a number of sports journals. The parties stipulated that the phone numbers called by Agent Sandusky were registered to the residence of Robert Dugan. Defendant did not testify.

Following the denial of defendant's motion for a directed finding at the close of the State's case, she was found guilty by the jury of syndicated gambling. Defendant's post-trial motion was denied and she was sentenced to a term of two years' probation.

Defendant first argues that she was not proved guilty of syndicated gambling beyond a reasonable doubt because there was no evidence that money was paid or promised to be paid to her. She contends that proof of this fact is essential to sustain a conviction for the offense of bookmaking, as that offense is defined in section 28—1.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par.

28—1.1(d)). The State responds that the gist of the offense of bookmaking is the receipt or acceptance of more than five bets totaling more than $2,000, and that the State need not prove that a defendant actually profited or expected to profit from the operation.

The question presented is one of first impression in this State. Section 28—1.1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(d)) defines the offense of bookmaking as follows:

> "(d) A person engages in bookmaking when he receives or accepts more than five bets or wagers upon the result of any trials or contests of skill, speed or power of endurance or upon any lot, chance, casualty, unknown or contingent event whatsoever, which bets or wagers shall be of such size that the total of the amounts of *money paid or promised to be paid to such bookmaker* on account thereof shall exceed $2,000. Bookmaking is the receiving or accepting of such bets or wagers regardless of the form or manner in which the bookmaker records them." (Emphasis added.)

In construing a statute, the courts are to ascertain and give effect to the true intent and meaning of the legislature. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174.) The specific words of a statute are the best indicators of the legislative intent behind the statute. (*Mack v. Seaman* (1983), 113 Ill. App. 3d 151, 155, 446 N.E.2d 1217.) Where the language of a statute is plain, there is no need for interpretation; however, where interpretation is required, the appellate court will select the construction which leads to a logical result, and will consider the object to be obtained and the result of various interpretations of the act. (*Jones v. Municipal Officers Electoral Board* (1983), 112 Ill. App. 3d 926, 929, 446 N.E.2d 256.) Criminal or penal statutes are to be strictly construed in favor of an accused, and nothing is to be taken by intendment or implication against him beyond the literal or obvious meaning of the statute. (*People v. Scribner* (1982), 108 Ill. App. 3d 1138, 1144, 440 N.E.2d 160.) However, such statutes are not to be construed so strictly as to defeat the obvious intent of the legislature. *People v. Scribner* (1982), 108 Ill. App. 3d 1138, 1144, 440 N.E.2d 160.

Turning to the language of the syndicated gambling statute, the legislature has expressly declared that its purpose in enacting the statute was "to restrain persons from engaging in the business of gambling for profit in this State." (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(a).) The statute further states that it "shall be liberally construed and administered with a view to carrying out this policy." (Ill.

Rev. Stat. 1981, ch. 38, par. 28—1.1(a).) Section 28—1.1(d) states that a person "engages in bookmaking when he receives or accepts more than five bets or wagers \*\*\*, which bets or wagers shall be of such size that the total of the amounts of money paid or promised to be paid to such bookmaker on account thereof shall exceed $2,000." This sentence clearly sets forth the requirement that the defendant accept or receive five or more bets totaling more than $2,000 before he may be convicted of the offense of syndicated gambling based upon bookmaking. See *People v. Dugan* (1984), 125 Ill. App. 3d 820, 828, 466 N.E.2d 687; *People v. Finn* (1978), 68 Ill. App. 3d 126, 132, 385 N.E.2d 103; *People v. Stavros* (1974), 18 Ill. App. 3d 1071, 1073, 311 N.E.2d 220.

The words "to such bookmaker" qualify the phrase "money paid or promised to be paid" and, in our opinion, are meant to clarify that phrase rather than to create the additional element that money must actually be paid or promised to be paid to the defendant himself. (See *City of Mount Carmel v. Partee* (1979), 74 Ill. 2d 371, 375, 385 N.E.2d 687.) This view is bolstered by the last sentence in the bookmaking statute which expressly states that *"[b]ookmaking is the receiving or accepting of such bets or wagers* regardless of the form or manner in which the bookmaker records them." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(d).) This language makes it clear that the offense is complete when the defendant "receives or accepts" the requisite number and amount of bets, and not when he actually receives or has an expectation of receiving the money wagered. The provisions of a statute should be read as a whole, and where the literal language found in the statute would defeat the legislature's clearly expressed objective or purpose the courts may modify, alter, supply or delete words to obviate the inconsistencies with the legislative intent. (*In re Application of People ex rel. Walgenbach* (1983), 117 Ill. App. 3d 14, 17, 452 N.E.2d 760, *rev'd on other grounds* (1984), ___ Ill. 2d ___; *Orbach v. Axelrod* (1981), 100 Ill. App. 3d 973, 980, 427 N.E.2d 399.) The interpretation urged by the defendant here would have the effect of shifting the emphasis of the bookmaking statute from the receipt or acceptance of wagers to the receipt or expectation of receipt of money. Had the legislature intended this result, it could have incorporated this element into the last sentence of the bookmaking provision which defines the essence of the offense.

It is also clear that the defendant's interpretation of the statute would contravene the expressed intention of the legislature that the syndicated gambling statute be liberally construed with a view to

restraining persons from engaging in the business of gambling for profit. (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(a).) The addition of the element urged by defendant would in some circumstances allow those engaged in organized gambling activities to escape prosecution under this section through the division of labor or duties. In order to obtain a conviction, the State would have to gather evidence as to both middlemen and heads of the organizations and prove not only the elements of the bookmaking statute, but also the elements of either a conspiracy or accountability. Such a result would not promote the purpose of the statute. We also reject the notion, argued by defendant, that the legislature intended the middleman in a gambling operation to be prosecuted under the misdemeanor gambling statute, and not under the syndicated gambling statute. (See Ill. Rev. Stat. 1981, ch. 38, par. 28—1(a)(10).) In *People v. Dugan* (1984), 125 Ill. App. 3d 820, 827, 466 N.E.2d 687, this court expressly found that the gambling offenses set forth in section 28—1 are incorporated into the syndicated gambling statute. Thus, it is the extent of the gambling activity involved that distinguishes the syndicated gambling statute from the gambling statute, and not the role of the participants. Further, the evidence in the instant case showed not only that defendant transmitted information as to wagers, a misdemeanor under the gambling statute (see Ill. Rev. Stat. 1981, ch. 38, par. 28—1(a)(10)), but also accepted or received wagers by telephone, conduct which is clearly proscribed by the bookmaking provision of the syndicated gambling statute.

The case of *People v. Eagle Food Centers, Inc.* (1964), 31 Ill. 2d 535, 202 N.E.2d 473, relied upon by defendant as support for her argument, is distinguishable from the instant case and therefore is of little guidance here. In *Eagle Food Centers, Inc.*, the issue was whether defendants had "paid or promised" consideration in exchange for a chance to win a prize at the defendant food stores. Here, there is no question that money was paid or promised to be paid as consideration in exchange for a chance to win a bet. Rather, the question here is whether that money must be paid or promised to the defendant himself, and this question was not addressed by the court in *Eagle Food Centers, Inc.*

Defendant next argues that Agent Sandusky was improperly permitted to testify as to Dugan's introduction of his daughter as, "This is my daughter, Marilyn, the one you call your bets into ***." Defendant argues that this statement constituted impermissible hearsay and was neither an implied admission of defendant nor a declaration of a co-conspirator made in furtherance of the conspiracy. These

were the two grounds relied upon by the prosecutor for the statement's admission at trial.

It is well established that when a statement, incriminating in character, is made in the presence and hearing of the accused, and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of defendant's failure to deny it are admissible as evidence of his acquiescence in its truth. (*People v. Morgan* (1976), 44 Ill. App. 3d 459, 462, 358 N.E.2d 280.) In order to qualify as an implied admission or an admission by silence, it is necessary that the circumstances be such " 'that the accused has heard the statement implicating him and has voluntarily refused to challenge the statement.' " (*People v. McCain* (1963), 29 Ill. 2d 132, 135, 193 N.E.2d 784, quoting *People v. Nitti* (1924), 312 Ill. 73, 91, 143 N.E. 448; see also *People v. Simpson* (1976), 39 Ill. App. 3d 318, 321-22, 349 N.E.2d 441.) Because the principle permitting admission is that the natural reaction of an innocent person would be to deny the accusation, and that silence is an admission of guilt, proof of a defendant's silence is essential to the admission of the declaration. *People v. McCain* (1963), 29 Ill. 2d 132, 135, 193 N.E.2d 784; *People v. Simpson* (1976), 39 Ill. App. 3d 318, 321, 349 N.E.2d 441.

Defendant argues that her father's statement of introduction does not qualify as an implied admission because the State failed to prove: (1) that defendant heard the statement; (2) that defendant reacted to the statement, even by her silence; and, (3) that defendant would naturally be expected to deny the statement. With respect to the first and third arguments, it has been held that whether an accusation was heard and whether the circumstances were such that a response would normally be made, are questions for the trial court or, as here, the trier of fact, to determine. (*People v. Bush* (1963), 29 Ill. 2d 367, 372, 194 N.E.2d 308, *cert. denied* (1964), 376 U.S. 966, 11 L. Ed. 2d 983, 84 S. Ct. 1129; *People v. Homer* (1956), 8 Ill. 2d 268, 273, 133 N.E.2d 284.) There was evidence in the present case from which the jury could reasonably conclude that defendant heard the statement and would naturally have denied it had it been false. The fact that the statement was an introduction of Agent Sandusky to defendant, that Dugan was in close proximity to defendant at the time he made the statement, and that the noise level in the restaurant was not such that the statement could not be heard, are all circumstances from which the jury could reasonably conclude that defendant heard her father's statement of introduction. (See *People v. Homer* (1956), 8 Ill. 2d 268, 273, 133 N.E.2d 284.) Similarly, we think that the statement, if heard, was of the type that

would normally be denied or objected to by one who was innocent of any wrongdoing. Dugan's description of defendant, in her presence, as being "the one you call your bets into" on its face identifies defendant as playing an active and ongoing role in an established gambling operation. (See *People v. Smith* (1962), 25 Ill. 2d 219, 224, 184 N.E.2d 841.) While the statement apparently was not made in an accusatory tone, it nonetheless should have been evident that defendant was being painted or portrayed as a participant in illegal and prohibited activity. Under these circumstances, one innocent of such activity would normally and naturally deny or correct such an impression.

Although it affirmatively appears that defendant must have heard the statement and would normally be expected to deny it, there is nothing in the record here to indicate whether defendant remained silent or denied the accusation. (See *People v. McCain* (1963), 29 Ill. 2d 132, 135, 193 N.E.2d 784; *People v. Simpson* (1976), 39 Ill. App. 3d 318, 321, 349 N.E.2d 441.) In order for such a statement to be admissible under the implied-admission exception to the hearsay rule, the State must establish the defendant's failure to deny the accusation. (*People v. McCain* (1963), 29 Ill. 2d 132, 135, 193 N.E.2d 784.) It is not the defendant's responsibility to prove he denied the accusation; thus, the absence of such proof by the State renders the admission of the statement erroneous. (*People v. McCain* (1963), 29 Ill. 2d 132, 135, 193 N.E.2d 784; *People v. Simpson* (1976), 39 Ill. App. 3d 318, 321, 349 N.E.2d 441.) We do not believe, as the State suggests, that Sandusky's subsequent conversation with defendant at the Green Mill Restaurant about "calling in the bets" constituted evidence of defendant's acquiescence in her father's statement of introduction. While such evidence may be independently relevant to establish defendant's guilt, it does not constitute direct proof of the defendant's reaction to the challenged statement. Accordingly, we conclude that Dugan's statement was inadmissible under the implied-admission exception to the hearsay rule.

Defendant also contends that Dugan's statement is inadmissible under the co-conspirator's declaration exception to the hearsay rule. Under this exception, the acts and declarations of a co-conspirator made in furtherance of the conspiracy are admissible against a defendant even when they are made out of the defendant's presence. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 945, 455 N.E.2d 733.) In order to avail itself of the co-conspirator exception, it is not necessary for the State to charge the crime of conspiracy; the State is merely required to establish a *prima facie* case by inde-

pendent evidence that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 945, 455 N.E.2d 733; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 291, 395 N.E.2d 968.) The existence of the agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the accused. (*People v. Columbo* (1983) 118 Ill. App 3d 882, 945, 455 N.E.2d 733; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 291, 395 N.E.2d 968.) Finally, statements made in furtherance of a conspiracy are those which had the effect of advising, encouraging, aiding or abetting its perpetration. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 948, 455 N.E.2d 733; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 292, 395 N.E.2d 968.) Thus, a statement which is merely a narrative of past occurrences will not satisfy this requirement since it does not further any objective of the conspiracy. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 948, 455 N.E.2d 733; *People v. Meagher* (1979), 70 Ill. App. 3d 597, 603-04, 388 N.E.2d 801.) In the present case defendant argues, first, that there was no *prima facie* showing of a conspiracy between Dugan and defendant, and, second, that even if a conspiracy existed, Dugan's statement of introduction was not made "in furtherance" of any such conspiracy.

 With respect to defendant's first argument, the record contains sufficient evidence to establish a *prima facie* case of a conspiracy between Dugan and defendant. Dugan initially informed Agent Sandusky that he could place bets on horse races with either "Marilyn or Deb," whom Sandusky could reach at one of two phone numbers registered to Dugan's home. When Sandusky first called one of these numbers, he told the woman answering that "Bob Dugan said it was okay to call this number." The woman then responded, "This is Marilyn, what can I do for you?" Subsequently, Sandusky spoke with this same woman on numerous occasions, each time placing his bets with her and receiving betting odds and information as to winnings and losses from her. On several occasions the woman, who identified herself as "Marilyn," referred to "her books" and informed Sandusky that he could either collect from or pay Dugan. Finally, Agent Sandusky had a conversation with defendant in person at the Green Mill Restaurant about "calling in bets" and about defendant's sister, Debbie, "who worked with her." Dugan was also present. Sandusky recognized the defendant's voice as being the same voice he spoke with on the telephone. From all this evidence,

the trial court could reasonably conclude that defendant and her father, Robert Dugan, were engaged in a common plan to accept or receive bets on various sporting events.

We also are of the opinion that the statement was made "in furtherance" of the conspiracy. Dugan's use of the present tense verb "call," rather than the past tense verb "called," makes it clear that he was not simply describing an event or events which had already occurred. (*Cf. People v. Simpson* (1976), 39 Ill. App. 3d 318, 320-21, 349 N.E.2d 441.) Rather, the phrase, "the one you call your bets into," was clearly referring to an ongoing and present relationship between Agent Sandusky and defendant, of which Dugan was obviously aware. It has been held that statements of one co-conspirator accompanying or explaining the common design are admissible against all co-conspirators. (*People v. Hoover* (1976), 35 Ill. App. 3d 799, 805, 342 N.E.2d 795; *People v. Daniels* (1968), 92 Ill. App. 2d 207, 213, 235 N.E.2d 305.) While this proposition has been questioned when the statement is merely explanatory of past occurrences (*People v. Meagher* (1979), 70 Ill. App. 3d 597, 602, 388 N.E.2d 801), we believe it is applicable where the statement in question is explanatory of present events. The statement in the present case was explanatory of ongoing events, as evidenced by Dugan's use of the present tense word "call," by the fact that the statement was made in the middle of the time period charged in the indictment (see *People v. Meagher* (1979), 70 Ill. App. 3d 597, 601, 388 N.E.2d 801), and by the fact that it was made to an individual whom Dugan believed was a participant in the ongoing gambling operation. (See *People v. Columbo* (1983), 118 Ill. App. 3d 882, 946-47, 455 N.E.2d 733.) Under all these circumstances, we conclude that the statement was properly admitted under the co-conspirator's declaration exception to the hearsay rule.

For the reasons stated above, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

SCHNAKE and REINHARD, JJ., concur.